UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------×

SUNGHO MATTHEW LEE,

           *Plaintiff,*                            **19 CV 4435**

    *v.*

OCTAGON CREDIT INVESTORS, LLC *and* ANDREW      **COMPLAINT**
GORDON, *individually*;

          *Defendants.*

-------------------------------------------------------------------------×

      Plaintiff Sungho Matthew Lee, by his counsel, The Law Offices of Veronica S. Jung

PLLC, alleges for his Complaint against Defendant Octagon Credit Investors LLC and

Defendant Andrew Gordon, as follows:

## PRELIMINARY STATEMENT

      1.      Mr. Lee ("Lee" or "Plaintiff") worked for Octagon Credit Investors, LLC

("Octagon" or "the Company") for over twenty years, starting as an analyst and working his way

up to become Octagon's Head of Research.  Octagon is a privately-owned investment services

firm with over $20 billion of assets under management.

      2.      Initially, Mr. Lee rose rapidly through the Company, and his work performance

and contributions to the Company were rewarded.  However, as Mr. Lee progressed further up

Octagon's corporate ladder, he began to face resistance to his continued ascent.  Mr. Lee's

performance remained outstanding, but Octagon began to block Mr. Lee's avenues for

advancement into the Company's senior leadership group.

      3.      By 2013, Mr. Lee accepted the position of Head of Research.  After assuming this

position, Mr. Lee repeatedly sought to join Octagon's Investment Committee – a crucial step in

his career growth – but was repeatedly denied.  Only after five years – and specifically asking

Octagon's senior leaders if he had reached a "glass ceiling" did the Company appoint Mr. Lee to the Investment Committee.

4. After Mr. Lee was appointed to Octagon's investment committee, Octagon's CEO, Andrew Gordon, explicitly told Mr. Lee that Octagon would not promote Mr. Lee further.

5. Octagon's senior leadership and upper ranks are extraordinarily White. Mr. Lee was the only Senior Analyst of color and the only person of color on the Investments Committee. Of the roughly ten people who report directly to Mr. Gordon, there is only one person of color among them.

6. Faced with a professional dead end at Octagon, Mr. Lee approached the Company about his future with Octagon. Mr. Lee expressed his frustration at the situation and attempted to find a solution that would enable Mr. Lee to continue to stay at the Company. Mr. Lee indicated that if Octagon could not accommodate him, he would be prepared to negotiate his exit from the Company.

7. Octagon refused to agree to the terms that Mr. Lee requested. Further, instead of negotiating Mr. Lee's exit, Octagon unilaterally ended Mr. Lee's employment at the Company.

8. Octagon violated federal, state, and city law by discriminating against Mr. Lee, and their actions caused him significant harm. Mr. Lee seeks damages and costs against Defendants for discriminating against him on the basis of his race and national origin, and retaliating against him for complaining of illegal discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq* ("NYCHRL").

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

9.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff

Lee's claims arising under § 1981.

10.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over

Plaintiff Lee's NYCHRL claims, as these claims are so related to the claims within such original

jurisdiction that they form part of the same case or controversy.

11.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District

Court for the Southern District of New York, as a substantial part of the events giving rise to

these claims occurred within this District.

## TRIAL BY JURY

12.      Plaintiff Lee respectfully requests a trial by jury.

## PARTIES

13.      Plaintiff Lee, at all times relevant hereto, was and is a resident of New York

County in the State of New York.

14.      Upon information and belief, at all times relevant hereto, Defendant Octagon was

and is a corporation organized under the laws of the State of Delaware with its principal place of

business located at 250 Park Avenue, New York, NY 10177.

15.      Upon information and belief, at all times relevant hereto, Defendant Andrew

Gordon was and is a resident of Fairfield County in the State of Connecticut.

## STATEMENT OF FACTS

16.      Plaintiff Lee is an investment professional.  He is a 45 year-old Korean American

man, and a citizen of the United States.

17.      Mr. Lee began working for Octagon in 1998 as a financial analyst.

3

18.     Mr. Lee had financial and investment experience prior to joining Octagon, working in the investment divisions of Chase and MetLife.

19.     Mr. Lee was very successful at Octagon.  He consistently outperformed his peers and delivered significant financial gains for the Company.

20.     Because of his skill, expertise, and depth of knowledge, Mr. Lee advanced quickly through the Company, earning promotions to Principal in 2006, then to Senior Analyst and ultimately to Head of Research in 2013.

21.     Mr. Lee's performance remained consistently stellar after these promotions.  For example, Mr. Lee singlehandedly accounted for over a third of Octagon's entire returns in 2016.

22.     Despite his outstanding performance, Mr. Lee began to encounter serious opposition to any further promotion after becoming Head of Research in 2013.

23.     After Mr. Lee's 2013 promotion, the next logical step in his career at Octagon would have been to join Octagon's Investment Committee (the "IC").  Octagon typically taps members of the IC for upper-level positions at the Company.

24.     The IC reviews Octagon's investment opportunities and determines which are eligible for investment by the firm.  Mr. Lee, as Head of Research and one of the Company's most successful analysts, was a natural fit for the IC.

25.     Between 2013 and 2018, Mr. Lee repeatedly asked to join the IC, taking the issue up directly with Octagon's CEO, Andrew Gordon.

26.     Mr. Gordon consistently rejected Mr. Lee's requests, but, during the same time period, appointed a White employee to the IC who had joined the Company after Mr. Lee.

27.     After years of Mr. Lee's requests, Mr. Gordon agreed to appoint Mr. Lee to the IC as an observer, but not a full member.  As an observer, Mr. Lee could not officially weigh in on the Company's investment decisions.

28.     Mr. Lee was extremely frustrated and discouraged by his lame-duck role on the IC.  In January 2017 Mr. Lee reached out to each member of the IC – Lauren Basmadjian, Gretchen Mohr Lam, Michael Nechamkin, and Mr. Gordon – to discuss why Octagon would not appoint him to the IC as a full member.  Mr. Lee set up meetings with each in an effort to resolve the situation.

29.     During his conversations with Ms. Basmadjian, Ms. Mohr Lam, and Mr. Nechamkin, Mr. Lee expressed his concern that he had reached a "glass ceiling" at the Company because of his race.

30.     In fact, Mr. Lee explicitly told Ms. Mohr Lam that he believed Mr. Gordon was responsible for the subtle racism at Octagon that had stymied his advancement.

31.     Finally, in 2018, Octagon appointed Mr. Lee to the Committee as a full member.

32.     This appointment did not amount to the turning point which Mr. Lee had hoped; instead, Mr. Lee found that his career at Octagon had reached a dead end.

33.     Both before and after Mr. Lee's full-time appointment to the IC, Octagon excluded him from executive-level processes and discussions.  By doing so, Octagon effectively prohibited Mr. Lee from developing the necessary experience to continue to grow at the Company.

34.     By 2018, it became apparent that Mr. Lee – Head of Research and a member of the IC – was only a nominal member of Octagon's senior leadership, with none of the authority or responsibilities enjoyed by his counterparts and other IC members.

35.     Despite Mr. Lee's elevated title, Octagon did not include Mr. Lee in high-level strategic conversations, it barred Mr. Lee from attending important investor meetings, and it refused to allow Mr. Lee to engage in discussions on performance reviews or compensation at the Company.

36.     Octagon's leadership is overwhelmingly White.  While the Company does hire more women than the typical financial institution, its leadership and executive teams are racially homogeneous.

37.     While Octagon's parent company, Conning, holds itself out as valuing diversity, Octagon does not share that goal.

38.     In fact, during a meeting with Conning executives, Mr. Gordon omitted Conning's diversity initiative from Octagon's materials.

39.     When challenged on this omission by Conning, Mr. Gordon claimed that it had been an "oversight."

40.     Not only did Conning, Octagon's immediate parent company, mandate diversity initiatives, but Conning's parent, Cathay Financial Holdings, is itself a major Taiwanese institution.  Despite all this, Octagon continued to exclude people of color from executive and leadership positions.

41.     Mr. Lee, frustrated, took it upon himself to try to improve the company's diversity by being involved in lower-level hiring decisions, and was directly responsible for Octagon's hiring several people of color into the Company.

42.     Octagon's upper ranks, however, remain nearly entirely White.  For example, at the time of Mr. Lee's departure, Octagon employed ten people with the title "Senior Analyst": nine White men and Mr. Lee.

43.      This demographic trend extends above the Senior Analyst level.  Octagon's

Portfolio Managers are exclusively White.  There is not one person of color in Octagons' C-

suite.  Octagon's own website and other published materials illustrate the fact that the Company

is overwhelmingly White.

44.      On or about January 11, 2019, Mr. Lee met with Mr. Gordon to discuss Mr. Lee's

dissatisfaction with his role in 2018.

45.      During that meeting, Mr. Lee sought to explore a possible path for his continued

growth at Octagon.  If no such path existed, Mr. Lee requested that Mr. Gordon start tolling the

non-compete agreement barring Mr. Lee from finding comparable employment within a year of

his employment at Octagon, so that Mr. Lee could leave the Company.

46.      In particular, as the Head of Research at Octagon, Mr. Lee specifically asked Mr.

Gordon to be involved in conducting performance reviews for other analysts on his team.

47.      Mr. Gordon did not agree to give Mr. Lee any increased authority or

responsibility commensurate with Mr. Lee's White counterparts on the Investment Committee,

and flatly refused to allow Mr. Lee to participate in performance reviews.

48.      Over the course of the subsequent month, into February 2019, Mr. Lee again

spoke with Mr. Gordon and other Octagon stakeholders, including Lauren Basmadjian, Gretchen

Mohr Lam, and Michael Nechamkin about Mr. Lee's future at the Company.

49.      Mr. Lee repeatedly expressed both his desire to stay at Octagon and his frustration

at his current role with the Company.

50.      Mr. Lee explicitly complained that he felt that his race was a factor in Octagon's

decision to block his further promotion at the Company.

51.     None of Mr. Lee's efforts were able to change Mr. Gordon's steadfast refusal to grant Mr. Lee additional responsibility.

52.     After Mr. Lee complained of racism at Octagon, his situation at the Company worsened.

53.     Not only did Mr. Gordon continue to refuse to grant Mr. Lee any additional responsibilities, but the Company officially declared that Mr. Lee had resigned.

54.     Octagon's position was not an accurate representation of Mr. Lee's request: Mr. Lee only suggested the possibility of his resignation if he and the Company could not reach an agreement on his role.  Further, Mr. Lee expressly conditioned his willingness to resign on reaching a separation agreement with the Company.

55.     After Mr. Lee's counsel contacted Octagon to explicitly place the Company on notice that its actions were discriminatory, Octagon escalated its mistreatment of Mr. Lee by falsely claiming that he was failing to cooperate with the Company and in breach of his fiduciary duty to Octagon.

56.     The Defendants further retaliated against Mr. Lee by unilaterally setting an arbitrary "resignation" date, after which Mr. Lee would no longer be employed by the Company, effectively terminating Mr. Lee's employment.

57.     On that date, Friday, March 8, 2019, Mr. Lee worked his last day for Octagon.

58.     Defendants first discriminated against Mr. Lee by restricting his growth at the Company because of Mr. Lee's race.  When Mr. Lee complained to Defendants about their discriminatory actions, Defendants retaliated against Mr. Lee by, ultimately, firing him.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Race Discrimination in Violation of Section 1981 of the Civil Rights Act of 1866**
**(Against All Defendants)**

59.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 58 with the same force as though separately alleged herein.

60.     Section 1981 of the Civil Rights Act of 1866 prohibits discrimination in contract, such as employment, on the basis of race.

61.     Defendants discriminated against Plaintiff Lee on the basis of his race by taking adverse employment action against him, up to and including his termination.

62.     As such, Defendants violated Section 1981.

63.     As a direct and proximate consequence of Defendants' discrimination, Plaintiff Lee has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

64.     Defendants' discriminatory treatment of Plaintiff Lee was willful and/or in reckless disregard of Plaintiff Lee's protected rights.  Accordingly, Plaintiff Lee is entitled to an award of punitive damages against Defendants.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of § 1981**
**(Against All Defendants)**

65.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 64 with the same force as though separately alleged herein.

66.     Section 1981 prohibits retaliation against individuals who assert their rights under Section 1981.

67.     Plaintiff Lee asserted his rights under Section 1981 when he put the Company on notice that it had discriminated against him on the basis of his race.

68.     Defendants retaliated against Plaintiff Lee by further restricting his career at the Company and ultimately terminating his employment.

69.     As a direct and proximate consequence of Octagon's discrimination, Plaintiff Lee has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

70.     Defendants' retaliation against Plaintiff Lee was willful and/or in reckless disregard of Plaintiff Lee's protected legal rights.  Accordingly, Plaintiff Lee is entitled to an award of punitive damages against Defendants.

## THIRD CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL
### (Against All Defendants)

71.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 70 with the same force as though separately alleged herein.

72.     The NYCHRL prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of, *inter alia*, their race, gender, national origin, and pregnancy.

73.     Defendant Octagon is an employer as contemplated by the NYCHRL, and Plaintiff Lee is an employee as contemplated by the NYCHRL.

74.     Defendant Gordon is a managerial employee subject to individual liability under the NYCHRL.

75.     Defendants discriminated against Plaintiff Lee on the basis of his race by taking adverse employment action against him, including denying him promotion.

10

76. As such, Defendants violated the NYCHRL.

77. As a direct and proximate consequence of Defendants' discrimination, Plaintiff Lee has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

78. Defendants' discriminatory treatment of Plaintiff Lee was willful and/or in reckless disregard of Plaintiff Lee's protected rights. Accordingly, Plaintiff Lee is entitled to an award of punitive damages against Defendants.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of New York City Human Rights Law
### (Against All Defendants)

79. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 77 with the same force as though separately alleged herein.

80. The New York City Human Rights Law prohibits retaliation against individuals who assert their rights under the New York City Human Rights Law.

81. Plaintiff Lee asserted his rights under the New York City Human Rights Law when he put the Defendants on notice that it had discriminated against him on the basis of his race.

82. Defendants retaliated against Plaintiff Lee by further restricting his career at the Company and ultimately terminating his employment.

83. As a direct and proximate consequence of Defendants' discrimination, Plaintiff Lee has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

84.     Defendants' retaliation against Plaintiff Lee was willful and/or in reckless disregard of Plaintiff Lee's protected legal rights.  Accordingly, Plaintiff Lee is entitled to an award of punitive damages against Defendants.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages to be determined at trial;

B.  For the second cause of action, damages to be determined at trial;

C.  For the third cause of action, damages to be determined at trial;

D.  For the fourth cause of action, damages to be determined at trial; and

E.  For such other and further relief as the Court deems just and proper.

Dated:          New York, New York
                May 15, 2019

Respectfully Submitted,

LAW OFFICES OF VERONICA S. JUNG, PLLC

By:     /s/ Veronica S. Jung_____
        VERONICA S. JUNG (VJ-6211)
        OWEN H. LAIRD (WL-6994)
        200 Park Avenue, Suite 1700
        New York, NY 10166
        Telephone: (212) 897-1981
        Facsimile: (212) 682-0278

*Attorneys for Plaintiff Sungho Matthew Lee*